**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

─────────────

**No. 24-4565**

─────────────

UNITED STATES OF AMERICA,

    Plaintiff – Appellee,

  v.

COLBY EDWARD JOYNER,

    Defendant – Appellant.

─────────────

Appeal from the United States District Court for the Western District of North Carolina, at Charlotte.  Robert J. Conrad, District Judge.  (3:22-cr-00180-RJC-SCR-1)

─────────────

Argued:  January 30, 2026        Decided:  August 12, 2026

─────────────

Before KING, THACKER, and RICHARDSON, Circuit Judges.

─────────────

Affirmed by published opinion.  Judge Richardson wrote the opinion, in which Judges King and Thacker joined.

─────────────

**ARGUED:**  Kristen Marie Santillo, GELBER & SANTILLO PLLC, New York, New York, for Appellant.  Amy Elizabeth Ray, OFFICE OF THE UNITED STATES ATTORNEY, Asheville, North Carolina, for Appellee.  **ON BRIEF:**  Fern Mechlowitz, GELBER & SANTILLO PLLC, New York, New York, for Appellant.  Russ Ferguson, United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Charlotte, North Carolina, for Appellee.

RICHARDSON, Circuit Judge:

Colby Joyner, a licensed physician assistant, took a part-time, remote job with MedCare Staffing, Inc., a telehealth company. His job was simple: review patient files that the company sent him and sign forms ordering genetic tests for Medicare beneficiaries. Over ten months, Joyner signed orders for some 607 beneficiaries—people he certified were his "patients," despite having spoken with only about 20 of them. For each file he reviewed, he was paid $12 to $15, whether or not he approved the testing. Based on his orders, laboratories billed Medicare for more than 14,600 tests—over $10 million in claims. A jury convicted Joyner of healthcare fraud under 18 U.S.C. § 1347, and of making false statements related to healthcare matters under 18 U.S.C. § 1035(a). And the district court sentenced him to 72 months' imprisonment.

Joyner asks us to undo his conviction and sentence. His main contention is that the district court deprived him of a fair trial by excluding documents relating to MedCare's internal compliance efforts, by quashing trial subpoenas for four witnesses who invoked their Fifth Amendment privilege, and by overruling his objection to the prosecution's rebuttal summation. He also says the jury was improperly instructed, the evidence was insufficient, and the Guidelines calculation was wrong.

We find no reversible error. The district court acted within its discretion in excluding the compliance documents under Federal Rule of Evidence 403, whatever their marginal relevance may have been. It permissibly excused the four witnesses after a proper and particularized inquiry. Assuming the prosecution's rebuttal improperly invited an adverse inference from the absence of witnesses who had asserted the Fifth Amendment

2

privilege, the isolated comment did not prejudice Joyner's substantial rights. Joyner's remaining challenges to his convictions and sentence fare no better. We therefore affirm.

## I.    BACKGROUND

Joyner graduated from a physician-assistant program and held a North Carolina physician-assistant license. In August 2018, while working full-time at a separate clinic, he took a remote, part-time position with MedCare Staffing, a telehealth company also known as Provider Partners or Telehealth Solutions (collectively, "MCS"). Thomas Harbin and Rhonda Polhill owned MCS. Dr. Kevin Smith served as its medical director, and Sara Smola as its telehealth-operations manager. MCS employed doctors, nurses, and physician assistants across the country. These employees used patient information supplied by MCS's clients to support approvals for medical equipment and genetic testing. Joyner was one of these employees. Christopher White was the owner of two of MCS's corporate clients: Helix and Whitewater.

At first, Joyner reviewed files to determine whether patients qualified for durable medical equipment. A few months in, White's companies were expanding to include genetic testing. In October 2018, White and Dr. Smith trained Joyner and others on documenting medical necessity for two kinds of genetic tests and on completing laboratory requisition forms, letters of medical necessity, and cover letters transmitting results. For cancer genetic testing, Joyner was instructed that a personal or family history of cancer satisfied medical necessity. For pharmacogenetic testing, he was taught that medical necessity was met if a patient took multiple medications and risked adverse drug events, or reported side effects. MCS initially told Joyner to call patients to confirm they wanted

3

testing. But in December 2018, Smola advised him that he was responsible only for "chart review and signature" and did not need to call patients unless there was a discrepancy, because MCS had "a team of in-house Medical Assistants and Registered Nurses to call patients." J.A. 1184. Joyner reviewed files under these criteria until he resigned in July 2019, citing concerns about MCS's practices. He was paid per file regardless of whether he approved testing, earning roughly $17,628 in total. Joyner never personally billed Medicare.

A grand jury charged Joyner with one count of healthcare fraud, 18 U.S.C. § 1347, six counts of false statements relating to healthcare matters, 18 U.S.C. § 1035(a), and with aiding and abetting those offenses, 18 U.S.C. § 2. The indictment alleged that the scheme arose out of Joyner's work for MCS—specifically, his signing laboratory requisition forms that White's companies had filled out in advance and that were "provided to him by [MCS] and its clients." Those forms concerned beneficiaries whom others had already pre-selected for genetic and pharmacogenetic testing. J.A. 19–21. The government's theory was that the forms Joyner signed contained at least three false statements: that the beneficiaries were Joyner's "patients," that he would use the test results to pursue care for them, and that the tests were medically necessary.

Before trial, the government moved in limine to exclude a set of defense exhibits: MCS's internal policies and procedures, emails among MCS management documenting compliance efforts, MCS's correspondence with the American Telemedicine Association ("ATA") about the definition of a "patient encounter," materials reflecting that MCS retained a Medicare-compliance consultant, and a legal opinion letter. J.A. 1246. The

4

government argued that these documents were irrelevant to Joyner's intent because he never received or reviewed them. Joyner responded that they reflected MCS's due-diligence and good-faith compliance efforts, which bore on the existence (or not) of the charged scheme. The district court granted the motion, reasoning that the charged scheme was "very tailored to the conduct and intent of Mr. Joyner, not MCS." It added that any probative value was substantially outweighed by "a high degree of risk of confusion" and "unfair prejudice, by distracting the jury from the conduct and the intent of Mr. Joyner to [that of] others." J.A. 153.

Earlier on, Joyner had sought a court order requiring MCS to produce documents. In that request, Joyner had explained that his theory of the case was that MCS, Smith, and White "knew the Company's business model was illegal but withheld that information" from providers like Joyner. J.A. 30. That theory proved consequential when Joyner later served trial subpoenas on four MCS witnesses—Smith, Polhill, White, and Smola—each of whom naturally sought to invoke the Fifth Amendment. The day before trial, counsel for Smith and Polhill told the court that both would assert their Fifth Amendment privilege if called, citing what they described as false allegations against them in Joyner's pretrial filings. The court deferred the issue, and the trial began on June 8, 2023.

In his opening statement, Joyner's counsel told the jury that it would "hear . . . testimony" that his employer told him not to call patients, thereby relieving him of any duty to do so. He also said that the jury would "hear" Smith, Polhill, and Smola say that they thought White's companies "were on the up-and-up," but that the evidence would

5

show White was a "fraudster" who lied, cheated, and stole, and that Smith and Polhill "took it hook, line, and sinker." J.A. 179, 182.

The government's case featured Medicare expert Stephen Quindoza, who testified that Medicare covers genetic and pharmacogenetic testing only when ordered by a treating physician who uses the results in the patient's further treatment, and that Medicare did not cover tests ordered through an asynchronous encounter (one in which provider and patient never interact in real time). The jury also heard that White had warned providers not to order too many tests at once to avoid being "flagged," described the approval process as "plug and play," and instructed staff to avoid "no-no words" like "free" and "Medicare." J.A. 302, 800–01, 1197, 1200.

Mid-trial, the district court held an evidentiary hearing on the subpoenaed witnesses, directing Joyner's counsel to have the witnesses present on Monday, June 12. White appeared through counsel and represented that he would invoke the Fifth Amendment as to any questions related to the charges against Joyner. Although he had pleaded guilty in the Middle District of Florida to a kickback conspiracy, his plea agreement protected him only in that district. Smola appeared in person, said that Joyner's counsel had made "false accusations" against her and MCS, and confirmed that she would invoke the privilege. J.A. 606–07. Smith and Polhill did not appear; their attorney reported that Joyner's counsel had told them they need not appear until June 13, and Joyner's counsel admitted telling Smith as much. Given that Joyner's counsel "excused" witnesses whom the district court had directed to appear, the court found "fault with the way defense counsel handled these proceedings." J.A. 628. The district court also found that all four witnesses had reasonable

6

cause to apprehend a danger of self-incrimination—particularly given the accusations leveled in Joyner's pleadings and opening statement—and quashed the testimonial subpoenas. It ruled in the alternative that exclusion was warranted under Federal Rule of Evidence 611(a) given defense counsel's "lack of transparency with the Court" and "side agreement[s]" with the witnesses. J.A. 82–83.

Joyner then testified in his own defense: He was inexperienced with genetic testing, believed MCS was a reputable company run by seasoned professionals, raised questions with management and was led to believe the questions reached Harbin and Dr. Smith, and never believed his work violated the law or Medicare rules. He acknowledged speaking with only about 20 of the more than 600 beneficiaries and that he "did not use" the test results. J.A. 791.

After the defense rested, the prosecution began its rebuttal summation:

[Y]ou just heard from defense counsel about how they put on a case. But think back to what they said at the beginning of this case. They told you that they will put evidence in front of you that will show that Colby Joyner is innocent . . . because [MCS] was tricked by Dr. White. And . . . they told you you're going to hear evidence, you'll see legal documents, showing that all their policies were vetted by lawyers. He said you were going to hear from all those folks, he put up photos of all those employees. Did you see any of that? Did any of that actually come into evidence? . . . No, it didn't. It fell flat. It went nowhere.

J.A. 867. The court overruled Joyner's objection and gave no curative instruction.

The court gave three instructions that matter here. Those instructions stated that a representation is false "if it is known to be untrue" or "when it constitutes a half-truth or effectively omits or conceals a material fact, provided it is made with the intent to defraud," J.A. 882; that intent to defraud could be found if Joyner "purposefully closed his eyes to

7

avoid knowing what was taking place around him," J.A. 884; and that Joyner could be found guilty on an aiding-and-abetting theory if he "join[ed] another person and perform[ed] acts with the intent to commit a crime," J.A. 884–85. During deliberations, the jury asked, "When is someone considered a patient under a [physician assistant]?" The court answered that the term carried its "ordinary, everyday meaning." J.A. 898–99. The jury then convicted Joyner on all counts.

The district court imposed a 72-month sentence, and Joyner timely appealed.

## II.    DISCUSSION

Joyner raises a number of challenges on appeal. We address each one in turn and find none convincing.

### A.    The District Court Permissibly Excluded The Internal MCS Documents

We review evidentiary rulings for abuse of discretion, and "we will only overturn a ruling that is arbitrary and irrational." *United States v. Nsahlai*, 121 F.4th 1052, 1060 (4th Cir. 2024) (quoting *United States v. Farrell*, 921 F.3d 116, 143 (4th Cir. 2019)). Even then, evidentiary errors are subject to harmless-error review, and an error is harmless if we can say "with fair assurance, after pondering all that happened without stripping the erroneous action from the whole, that the judgment was not substantially swayed by the error." *Id.* (quoting *United States v. Johnson*, 617 F.3d 286, 292 (4th Cir. 2010)).

Joyner argues that the district court abused its discretion by excluding documents showing MCS's compliance efforts. That evidence included the company's internal policies and procedures; emails among MCS leadership; MCS's correspondence with the ATA about how that industry association "officially defines a patient encounter," J.A.

8

1237; materials reflecting that MCS retained a Medicare-compliance expert and scheduled monthly compliance meetings; assurances to providers that MCS was "in constant pursuit of compliance," J.A. 1255; and the attorney opinion letter concluding that MCS was "quite compliant with applicable law," J.A. 1246. On Joyner's telling, the documents did three things. They tended to rebut the existence of a scheme to defraud, undermined the inference that fraud would have been obvious to him, and—through the ATA correspondence—bore on whether calling the beneficiaries his "patients" was false at all. He claims that these exclusions denied him his constitutional due process right to present a defense.

We begin with framing. Joyner invokes the Constitution, but his complaint is, at bottom, that particular exhibits should have been admitted. That claim is "better framed as an evidentiary argument," subject to ordinary abuse-of-discretion review and harmlessness principles. *United States v. Malloy*, 568 F.3d 166, 177 (4th Cir. 2009); *see also Nsahlai*, 121 F.4th at 1059 n.7. And the record undermines any suggestion that Joyner was prevented from defending himself: He testified at length about his training, his communications with MCS management, his understanding of the forms, and his belief that the operation was lawful, and the jury heard MCS's compliance assurances through other admitted evidence. What remains is a routine ruling on the admissibility of evidence.

On *that* question, we need not embrace the district court's relevance rationale to affirm its ruling. The court excluded the inter-employee emails as irrelevant, explaining that Joyner had never seen these emails and that the charge was "very tailored to the conduct and intent of Mr. Joyner, not MCS." J.A. 153. The court also excluded the

9

company policies and legal memoranda as irrelevant, and ruled in the alternative that—even if relevant—the documents' probative value was substantially outweighed by "a high degree of risk of confusion, unfair prejudice, by distracting the jury from the conduct and the intent of Mr. Joyner to [that of] others." *Id.*

We may sustain an evidentiary ruling on any ground that the record supports, whether the district court invoked it or not. *United States v. Ferguson*, 140 F.4th 538, 546 (4th Cir. 2025) ("Evidence rulings may be affirmed if they are correct—whether the district court explains why or not."). So even if the district court relied on the wrong reason—or gave no reason—we ask only whether the ruling was right. *Id.* Here, the district court excluded the company policies and legal memoranda under both Rule 401 and Rule 403, and it excluded the inter-employee emails under Rule 401 alone. We need not parse those rationales, because the same Rule 403 balancing that the district court conducted supports excluding all of the challenged documents. We rest our decision there and express no view on the district court's Rule 401 analysis.[1]

Rule 403 permits a district court to exclude relevant evidence "if its probative value is substantially outweighed by a danger of one or more of the following:  unfair prejudice,

---

[1] The government contends that Joyner abandoned any Rule 403 argument by failing to brief it. Gov't Br. 39. Perhaps. Joyner's opening brief does mention Rule 403 and notes exclusion under it was "erroneous and an abuse of discretion." Opening Br. 22. But Joyner provided argument only as to relevance under Rule 401. *See Grayson O Co. v. Agadir Int'l LLC*, 856 F.3d 307, 316 (4th Cir. 2017) ("passing shot" insufficient). Even so, we exercise our discretion to reject the argument on the merits.
    We add that even if we ignored the Rule 403 basis for excluding the inter-employee emails, their exclusion was harmless. The identified emails documenting what MCS's officers said to one another could not have substantially swayed the judgment. *See Nsahlai*, 121 F.4th at 1060.

10

confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Fed. R. Evid. 403. Our review thus asks only how a reasonable jurist could have struck that balance, not whether we would have done so in the first instance. *See Nsahlai*, 121 F.4th at 1060.

Start with the probative-value side of the ledger. Whether the documents were probative depends on what the government had to prove. The government's theory of the case had two strands. First, Joyner himself knowingly executed a scheme to defraud Medicare through the false forms he signed. Second, he aided and abetted an existing scheme—run through MCS's clients and, above all, White—by supplying the one thing that scheme could not function without: a licensed provider's signature. On either strand, evidence that MCS's officers tried to comply with the law does little work for Joyner. A "scheme to defraud" requires "a plot, plan, or arrangement" executed through fraudulent transactions, *United States v. Bajoghli*, 785 F.3d 957, 962–63 (4th Cir. 2015), and aiding-and-abetting liability requires that the underlying offense was committed by someone whom the defendant knowingly and intentionally assisted. *See United States v. Moye*, 454 F.3d 390, 398 (4th Cir. 2006); *Rosemond v. United States*, 572 U.S. 65, 71 (2014). Nothing about either theory required the government to prove that MCS's officers possessed a fraudulent intent.

For one, White's underlying scheme—channeling pre-selected Medicare beneficiaries through pre-populated requisition forms to laboratories that billed Medicare millions—existed, or not, regardless of whether MCS's principals were knowing

11

participants, useful dupes, or something in between. So evidence that MCS's officers acted in good faith does not make the charged scheme less probable.

What's more, the documents are worth little as direct proof of Joyner's own state of mind with respect to the underlying scheme. Joyner concedes that he never saw these documents, and a document that he never saw cannot speak to what he believed. Indeed, Joyner remained free to introduce—and did introduce—evidence of everything he actually saw and heard. The excluded materials, by contrast, concerned matters he did not and could not have known about.

That leaves the indirect inference on which Joyner seeks to ground his relevance theory. The government argued at trial that the red flags surrounding this operation—the training video, the "plug and play" forms, the warnings about being "flagged," the absence of any real patient encounter—would have been open and obvious to any professional in Joyner's position. J.A. 835–36, 874. Joyner argues that if MCS's own sophisticated officers, armed with lawyers and compliance consultants, purported to believe the model was lawful, then the fraud was not obvious after all—which in turn makes it marginally less likely that Joyner recognized it.

Joyner has a plausible argument that this evidence might have had some relevance. If MCS's officers—professionals with the advice of counsel, a compliance consultant, and an industry association—believed in good faith that the model was lawful, a jury might infer that its illegality was not so obvious. Joyner, who had less information and expertise than they did, might have been less likely to have recognized its illegality.

12

But probative value is only one side of the Rule 403 balance.  And the inference that this evidence arguably supports is a step removed from the question that mattered.  What MCS's officers believed turned on what they told their lawyer, what they asked the association, and what their consultant reviewed—none of which bears directly on the red flags Joyner himself confronted when he reviewed files for hundreds of strangers, signed forms calling them his patients, and certified tests he would never use.  Thus, on the question that actually mattered—what Joyner knew or should have known—the documents carried materially less weight than he suggests.  The question, then, is whether the district court could reasonably conclude that even this diminished value was substantially outweighed by the dangers of admitting the evidence.  It could.

Three such dangers stood on the other side of the ledger.  Each was evident on the face of this record.  So exclusion was a reasonable resolution of the balance.

First, confusion of the issues.  This is not the unremarkable observation that admitting the documents would have introduced contested facts; contested facts are the stuff of every trial, and a factual dispute is not itself a reason to exclude relevant evidence.  Our concern is more specific.  In order to draw the inference that the fraud was not so obvious because MCS's officers thought the model was lawful, the jury would first have had to decide what those officers actually knew and believed:  that is, whether they were knowing participants in White's scheme, negligent dupes, or completely innocent.  That is a question about the culpability of people not on trial, and a different question from the one that the jury was empaneled to answer:  What did *Joyner* know?  Litigating this question would have required the jury to probe what facts MCS disclosed to its lawyer, whether its

13

compliance program was genuine or mere window dressing, and what its principals understood about White's operation—in essence, inviting the jury to assess the guilt or innocence of absent non-parties as a predicate to judging Joyner. Rule 403's worry about "confusing the issues" and "wasting time" concerns precisely this sort of excursion, which threatened to "distract[] the jury from the conduct and the intent of Joyner to [that of] others." J.A. 153.

Second—and relatedly—the risk of misleading the jury, particularly with regard to the legal opinion letter. Whether MCS's model complied with Medicare's requirements was a question of law on which the jury would be instructed by the court and informed by expert witnesses, not by a retained attorney's letter to his client. A lawyer's opinion cannot make lawful what the law forbids, and a jury shown a legal opinion stating that MCS's business model was compliant may struggle to keep that opinion in its proper place.[2] More problematically, the letter did not even offer a legal opinion about whether MCS's platform complied with Medicare's coverage rules. Rather, it addressed only the platform's compliance with Georgia law and with federal laws against kickbacks and self-referrals. Furthermore, its conclusion that the company was "quite compliant with applicable law" was conditioned on assumptions that the opining attorney did not test: that the physicians would adhere to each state's telemedicine requirements, including "the use of electronic visual access where required" and the generation of genuine patient medical records. J.A.

---

[2] True, the letter might have carried weight as advice-of-counsel evidence, but only for someone who saw and relied on it. Again, Joyner never saw the letter, so it could not support a reliance defense *for him*; its only realistic function was to suggest, obliquely, that the operation was lawful or that *someone else* thought so.

14

1246. So the district court could reasonably conclude that the letter could mislead the jury far more than it could illuminate how obvious the fraud would have been to Joyner.[3]

Third, cumulativeness. The jury did not lack evidence that MCS held itself out—internally and to its providers—as a compliant operation. It heard assurances from Dr. Smith and Polhill that MCS had "dotted their Is and crossed their Ts," J.A. 702, and was "conducting a professional and compliant operation," J.A. 722. And MCS's written communications to providers, including the December 2018 email restructuring Joyner's duties, were admitted into evidence. Joyner himself testified to the assurances he received and the trust he placed in MCS's leadership. The excluded documents would have only layered additional, secondhand iterations of the same basic point—MCS's purported compliance—at the cost of the dangers just described. This is why Rule 403 expressly allows a district court to decline "needlessly presenting cumulative evidence." Fed. R. Evid. 403.

Weighing these dangers against whatever thin probative value the excluded documents may have provided, the district court's exclusion was neither arbitrary nor

---

[3] That is true of the ATA correspondence no less than the rest of the documents. Joyner casts that letter as proof that "patient encounter" can encompass asynchronous review, and thus that calling the beneficiaries his "patients" was not false. But the governing coverage requirements were established at trial through Medicare's own rules and expert testimony, and a trade association's definitional gloss—solicited by MCS, and never seen by Joyner—invited exactly the collateral dispute over third-party understandings that the district court was justified to avoid. Furthermore, the government's falsity theory never rested on the word "patients" alone: The forms also represented that Joyner would use the test results to pursue care for the beneficiaries and that the tests were medically necessary, representations that Joyner's own testimony undercut.

irrational. *Nsahlai*, 121 F.4th at 1060. Thus, the district court did not abuse its discretion in excluding these documents under Rule 403.[4]

### B.    The District Court Permissibly Quashed The Testimonial Subpoenas

A district court's decision to quash the subpoena of a witness who will invoke his Fifth Amendment privilege is ultimately an evidentiary ruling reviewed under the same deferential standard, even when the defendant frames the exclusion as a denial of his right to present a complete defense. *United States v. Oliver*, 133 F.4th 329, 335 (4th Cir. 2025); *see United States v. Branch*, 537 F.3d 328, 342 (4th Cir. 2008).

Joyner challenges the district court's decision to excuse White, Smith, Polhill, and Smola from testifying after each invoked the Fifth Amendment privilege against self-incrimination.  As Joyner sees it, the district court's inquiry was insufficiently particularized in three ways.  First, it did not proceed question-by-question with each witness in-person.  Second, Smith, Polhill, and Smola faced no genuine incrimination risk once Joyner disclaimed any intent to accuse them of wrongdoing.  Third, White, having already pleaded guilty and been sentenced in the Middle District of Florida, had nothing left to incriminate.  Each fails.

---

[4] Joyner separately contends that the district court abused its discretion by overruling his objection to the government's cross-examination about his earnings as a physician assistant—questioning premised on salary figures never introduced into evidence, which the government later invoked in summation to portray Joyner as "one of the highest-paid physician assistants in the country, let alone North Carolina." J.A. 873. We see no abuse of discretion.  Joyner's defense rested in substantial part on his professed inexperience and the modesty of his pay from MCS, so his compensation and professional standing were fair subjects of cross-examination.  In any event, any error in permitting this brief exchange was harmless in light of the evidence of Joyner's conduct. *See Nsahlai*, 121 F.4th at 1060.

Start with the governing principles. "A criminal defendant's right to compel testimony is fundamental to sixth and fourteenth amendment due process rights." *Gaskins v. McKellar*, 916 F.2d 941, 950 (4th Cir. 1990). But that right must yield to a witness's valid privilege against self-incrimination. To police the boundary, "the trial judge must make a proper and particularized inquiry into the legitimacy and scope of the witness' assertion of the privilege." *Id.* A witness may be excused entirely only if he could legitimately refuse to answer every relevant question. *Id.* The privilege is generous in scope. It covers not only answers that would directly support a conviction but also those that "would furnish a link in the chain of evidence needed to prosecute" the witness. *Hoffman v. United States*, 341 U.S. 479, 486 (1951). At the same time, a witness's bare "say-so does not of itself establish the hazard of incrimination." *Id.* The hazard must be "substantial and real, and not merely trifling or imaginary." *Marchetti v. United States*, 390 U.S. 39, 53 (1968) (cleaned up). And again: Whether a particular witness's assertion clears that bar is committed in the first instance to the trial judge, whose ruling we review only for abuse of discretion. *Oliver*, 133 F.4th at 335.

Here, the district court's inquiry was sufficiently particularized. The court did not resolve the question on the papers the moment it arose. Rather, it cautiously deferred ruling until it could "talk to both sides." J.A. 157. It then announced before the close of the government's case that it would hold an evidentiary hearing. It also directed Joyner's counsel to produce the subpoenaed witnesses on June 12. At that hearing, the court heard from Smola in person, who explained that a filing by Joyner's counsel contained "false accusations" against her and MCS and confirmed her intent to invoke the privilege. J.A.

17

606–07.  It received and considered the written submission of counsel for Smith and Polhill, which invoked the privilege in response to the same accusations.  It heard from White's counsel, who explained that his plea agreement foreclosed further charges only in the Middle District of Florida.  And the court made witness-specific findings that each had reasonable cause to apprehend a danger of self-incrimination—findings it made with Joyner's contrary representations in view.

Joyner's principal rejoinder is procedural:  Because the privilege attaches question by question, he insists the district court was obliged to put each witness on the stand and rule question by question.  *See United States v. Miller*, 434 F. App'x 287, 293 (4th Cir. 2011).  That argument mistakes the privilege's substance for a script.  Our cases prescribe the substance of the inquiry, not its form:  No case of ours requires live, seriatim questioning to satisfy that duty.  *See Oliver*, 133 F.4th at 337–38; *see also United States v. Ramos*, 763 F.3d 45, 55 (1st Cir. 2014).  What matters is whether the district court could reasonably conclude, on a witness-by-witness basis, that each could legitimately refuse to answer the full range of relevant questions Joyner proposed to ask.  It could.

Consider what Joyner wished to ask, and of whom.  His own Rule 17 filing announced that his theory of the case was that MCS, Smith, and White "knew the Company's business model was illegal but withheld that information" from Joyner and other providers, and that Smola had trained him to follow unlawful procedures.  J.A. 30.  His opening statement told the jury that White was a "fraudster" who lied, cheated, and stole.  J.A. 182.  And the topics he identified for examination—MCS's structure, its relationship with White, its due diligence and compliance efforts, and the contents of its

18

training—called on these witnesses to give a sworn account of their own roles in designing and operating the very business model that the government was proving to be a vehicle for fraud.  Answers about what they knew of White's operation, what the laboratories were billing, what concerns were raised internally, and how the training and forms came to be could each "furnish a link in the chain" of a future prosecution.  *Hoffman*, 341 U.S. at 486.  Joyner responds by claiming that he had disavowed his earlier accusations, and that witnesses face no incrimination risk in simply denying wrongdoing.  But that assumes the witnesses would have testified that way.  We measure the hazard differently—by considering the answers that the question *could* elicit, not by the questioner's motivations; here, the questions Joyner proposed demanded accounts of the witnesses' own conduct at the center of an ongoing fraud investigation.  The district court thus found a real and appreciable danger.

Nor may Joyner complain that Smith and Polhill were not questioned in person.  They were absent from the June 12 hearing because *Joyner's own counsel*—contrary to the district court's express directive—advised them that they need not appear until June 13.  The district court found "fault with the way defense counsel handled these proceedings," attributed the witnesses' absence to "the poor communication of [Joyner's] counsel," and concluded that their absence did not "interfere with the Court's ability to make a particularized and proper inquiry" in light of their counsel's submissions.  J.A. 628–29.  A defendant cannot manufacture a procedural shortcoming—here, the lack of live questioning—through his own counsel's conduct and then present that shortcoming as

19

reversible error. *See Shields v. United States*, 273 U.S. 583, 586 (1927); *United States v. Herrera*, 23 F.3d 74, 76 (4th Cir. 1994). One who sows the deficiency reaps it.[5]

Finally, as to White's invocation of the privilege, Joyner argues that "where there can be no further incrimination, there is no basis for the assertion of the privilege." *Mitchell v. United States*, 526 U.S. 314, 326 (1999). Quite true. But here, there *could* be further incrimination. White's plea agreement protected him from additional charges only in the Middle District of Florida, and his counsel represented that he faced potential exposure in other jurisdictions. Testimony about his genetic-testing operation could readily supply evidence for charges in those jurisdictions. And Joyner's offer to confine questioning to White's sentenced conduct does not solve the problem; the conduct underlying White's Florida kickback conviction and the conduct at issue overlap, but they are not coextensive, and there is no reason to believe that his testimony could be cabined with the precision that Joyner supposes. *See Hoffman*, 341 U.S. at 486 (An answer need not convict to be privileged, only to "furnish a link in the chain."). The district court was thus entitled to credit counsel's representations and to conclude that White, too, could legitimately refuse to answer any and all relevant questions.[6] We therefore conclude that the district court did not abuse its discretion in quashing the subpoenas.

---

[5] Galatians 6:7 ("[W]hatever one sows, that will he also reap.") (English Standard Version).

[6] Because the district court acted within its discretion in excusing all four witnesses on Fifth Amendment grounds, we need not consider its alternative ruling under Federal Rule of Evidence 611(a). We note only that the rule's text speaks to the "mode and order of examining witnesses and presenting evidence," Fed. R. Evid. 611(a), and we have cautioned that it does not license a court to "foreclose a legitimate inquiry" of a witness's

### C.  The Prosecution's Rebuttal Does Not Warrant A New Trial

District courts enjoy broad discretion over closing arguments, and we will reverse only for clear abuse. *United States v. Baptiste*, 596 F.3d 214, 226 (4th Cir. 2010). To prevail, Joyner must show that the remarks (1) were improper and (2) "prejudicially affected the defendant's substantial rights so as to deprive him of a fair trial." *United States v. Wilson*, 135 F.3d 291, 297 (4th Cir. 1998) (cleaned up).

Joyner contends that the district court erred in overruling his objection to the beginning of the government's rebuttal summation, in which the prosecutor reminded the jury of the defense's opening-statement promises—the witnesses it would call, the documents it would present—and then asked, "Did you see any of that?  Did any of that actually come into evidence? . . .  No, it didn't.  It fell flat.  It went nowhere."  J.A. 867.

Even assuming that these remarks were improper,[7] they did not deprive Joyner of a fair trial.  Six factors drive the prejudice inquiry:  (1) the remarks' tendency to mislead, (2)

---

credibility altogether.  *United States v. Leake*, 642 F.2d 715, 718–19 (4th Cir. 1981). Whether Rule 611(a) could independently support the wholesale exclusion of these witnesses is a question we leave unanswered.

[7] Whether the remarks were improper is a close question.  The Fifth Amendment bars a prosecutor from commenting on a defendant's silence.  *Griffin v. California*, 380 U.S. 609, 612, 614 (1965).  And prosecutors may not comment on the absence of a witness who has a Fifth Amendment privilege not to testify.  *United States v. Golding*, 168 F.3d 700, 703 (4th Cir. 1999).  But this bar does not prevent a prosecutor from pointing out that the defense failed to produce testimony or evidence that it promised to the jury—even testimony that failed to materialize because of the Fifth Amendment privilege.  The Supreme Court so held in *Lockett v. Ohio*, 438 U.S. 586 (1978).  There, defense counsel's own promise that the jury would hear the defendant testify had "focused the jury's attention" on the missing testimony, such that the prosecutor's observation that she failed to testify "added nothing to the impression that had already been created."  *Id.* at 595.  Such is the risk of making promises in opening.

whether they were isolated or extensive, (3) the strength of the proof absent the remarks, (4) whether they deliberately diverted the jury to extraneous matters, (5) whether the defense's own conduct invited them, and (6) whether the court gave a curative instruction. *Wilson*, 135 F.3d at 299. No single factor controls, and all are weighed against the whole trial. *Id.* Five of the six run against Joyner.

First, the remarks' capacity to mislead was limited by their own framing. The prosecutor anchored the comment to "what [the defense] said at the beginning of this case." J.A. 867. That meant the jury's own memory of the opening statement. In that opening, Joyner's counsel promised testimony from multiple witnesses and documentary evidence. The jury then watched the defense's case end without hearing from those witnesses or seeing those documents. It did not need the prosecutor to explain that the opening's

---

Even so, it is not clear what the prosecutor conveyed in the statements that "*It* fell flat" and "*It* went nowhere." J.A. 867 (emphasis added). The government contends that this comment referred to the defense's unkept promises, not the witnesses' absence. On the government's reading, the antecedent of "it" was the "evidence" or "documents," and a prosecutor may permissibly observe that a party failed to produce evidence it told the jury to expect. J.A. 867; *see also id.* (noting defense counsel put up photos of those witnesses and said you would hear from them). That reading has real force. *See United States v. Francis*, 82 F.3d 77, 78–80 (4th Cir. 1996) (asking whether, in context, the prosecutor's statement was "manifestly intended to be, or was it of such character that the jury would naturally and necessarily take it to be a comment on the failure of the accused to testify"). So framed, the remark would distinguish this case from *Golding*, where the prosecutor initiated the invitation for the jury to speculate about why a specific privileged witness "didn't ever come up here and testify." 168 F.3d at 703.

Still, Joyner says the references to the witnesses who had invoked the privilege, rather than the unfulfilled promises, did invite speculation. Here, we need not decide whether the remark was improper; we assume without deciding that it was and conclude that it nevertheless was non-prejudicial.

22

promises had gone unfulfilled; it had observed as much firsthand.[8]  To conclude that the prosecution's remarks planted the inference of a collapsing defense assumes a jury that had forgotten the defense's opening and its own observation of the trial.  *See Lockett*, 438 U.S. at 595 ("[T]he prosecutor's closing remarks added nothing to the impression that had already been created by Lockett's refusal to testify after the jury had been promised a defense by her lawyer and told that Lockett would take the stand.").

Second, the remarks were isolated:  a single passage of roughly a dozen lines at the beginning of a rebuttal spanning eleven transcript pages, following a sixteen-page principal summation that did not touch the subject.  The prosecutor named no witness, made no reference to the witnesses' invocation of the Fifth Amendment, and did not return to the theme of these missing witnesses for the remainder of the rebuttal.  *Cf. Golding*, 168 F.3d at 703 (finding prejudice where prosecutor repeatedly pressed the absent-witness inference throughout closing rebuttal).

Third, the strength of the government's case further dissipates any prejudice.  The jury heard that though Joyner spoke with roughly 20 of more than 600 beneficiaries, his orders resulted in more than 14,600 genetic tests; that he repeatedly represented that he would use the test results to pursue their care despite admitting that he "did not use" them, J.A. 791; and that his training featured "plug and play" forms, warnings against ordering

---

[8] The remarks' ambiguity likewise blunts their force.  A reasonable juror could as easily have understood them to comment on the defense's unfulfilled promise of documentary proof—a permissible observation—as on the witnesses' absence.  A remark fairly open to an innocuous construction is, by the same measure, less apt to have misled the jury toward the impermissible inference Joyner alleges.  What makes the comment's propriety a close question is also what diminishes its capacity to prejudice.

23

too many tests at once to avoid being "flagged," and instructions to avoid "no-no words" like "free" and "Medicare."  J.A. 302, 800–01, 1197, 1200.

Fourth, the remarks did not divert the jury to extraneous matters.  Whether read as a comment on the defense's unkept promises or on the witnesses' absence, they addressed the defense's framing of the case, not some collateral subject intended to confuse or inflame the jury.

Fifth, the remarks were invited by the defense's own conduct.  A reviewing court "must not only weigh the impact of the prosecutor's remarks, but must also take into account defense counsel's opening salvo." *United States v. Young*, 470 U.S. 1, 12 (1985).  When counsel gave his opening, he knew that Smith and Polhill had, just one day earlier, announced their intent to invoke the privilege.  He also knew that he had alerted the court that his subpoenaed witnesses were "allud[ing] to taking the Fifth."  J.A. 155–56.  The court had likewise already announced its inclination to exclude the compliance documents.  Counsel nonetheless promised the jury it would "hear from all those folks" and see the documents.  J.A. 179, 182.  Though the court had not yet ruled on the subpoenas, they were genuinely contested.  An opening statement forecasts evidence counsel has a good-faith basis to expect; it is not a device for placing before the jury, as promised proof, testimony counsel had substantial reason to doubt would ever come in.  And in closing, the defense pressed the point, telling the jury that "[i]f there was evidence, they would have showed you."  J.A. 846.  The prosecutor's remarks responded to promises the defense itself made in opening.  *Cf. Young*, 470 U.S. at 12–13 (in assessing prejudice, a reviewing court considers the prosecutor's remarks in context, including defense counsel's own

24

statements). So even if the prosecution's remarks traded on the witnesses' absence—that is what makes it, on the assumption we have indulged, improper—their force was blunted by their responsive character.

That leaves the court's failure to give a curative instruction. That factor favors Joyner, as does the comment's potential to focus the jury on witnesses whom the court had excused and evidence the court had excluded. The remaining circumstances point the other way: The comment was brief, arose in rebuttal, did not mention the Fifth Amendment, and responded to specific promises in the defense opening. Thus, weighing all six factors "in the context of the entire trial," *Wilson*, 135 F.3d at 299, we are satisfied that the remark did not deprive Joyner of a fair trial.

**D.      The District Court Did Not Commit Plain Error In Its Jury Instructions**

We ordinarily review the decision to give a particular jury instruction for abuse of discretion and review de novo whether an instruction correctly states the law. *United States v. Miltier*, 882 F.3d 81, 89 (4th Cir. 2018). Where, however, a party fails to lodge a timely and specific objection as Federal Rule of Criminal Procedure 30(d) requires, our review of that unpreserved challenge is for plain error only. *See* Fed. R. Crim. P. 30(d); *United States v. Cowden*, 882 F.3d 464, 475 (4th Cir. 2018). Under that standard, Joyner must show an error that is plain, that affected his substantial rights, and that "seriously affects the fairness, integrity, or public reputation of judicial proceedings." *United States v. Olano*, 507 U.S. 725, 732 (1993) (cleaned up).

Joyner challenges two instructions: the aiding-and-abetting charge and how the court defined "false statement." Only the first challenge was preserved and giving the

25

aiding-and-abetting charge did not constitute an abuse of discretion. The second challenge was not preserved and fails under plain-error review.

### 1.    Aiding and Abetting

This challenge was preserved. At the charge conference, Joyner's counsel objected to giving the aiding-and-abetting instruction at all. He argued that the government had abandoned any accomplice theory by representing "that [its] case [was] not based on anyone aiding and abetting," and that no evidence showed that anyone had "aided and abetted." J.A. 539. But the government had said no such thing. In its motion in limine, the government had stated only that it did not "intend to call [the MCS employee] witnesses to testify." J.A. 37. This was a representation about the witnesses it planned to call, offered in support of excluding those witnesses' internal emails, *not* a disavowal of the accomplice theory charged in the indictment. Nevertheless, based on that mistaken understanding, defense counsel argued that the instruction "ha[d] the risk of confusing the jury" by "potentially blurring Chris White into this," when the evidence showed no communications between Joyner and White beyond the training video. J.A. 539. The district court overruled the objection, finding "evidence of aiding and abetting in terms of the prepopulated forms and other evidence," observing that "the bulk of the money defrauded from Medicare went to others in the scheme," and expressly noting the objection for the record. J.A. 539–40. We therefore review the decision to give the instruction for abuse of discretion.

There was no abuse. To establish aiding and abetting, the government must show that the defendant "knowingly associated himself with and participated in the criminal

26

venture." *United States v. Burgos*, 94 F.3d 849, 873 (4th Cir. 1996) (en banc) (cleaned up); *see Rosemond*, 572 U.S. at 71. A district court does not abuse its discretion by instructing the jury on that theory where the trial evidence would support a finding of those elements. The evidence here did. The jury heard that Joyner was one of many providers working through MCS and its clients. It heard that White warned providers not to order too many tests at once to avoid being "flagged," and described the approval process as "plug and play." And it heard that the operation funneled pre-selected beneficiaries through pre-populated forms that Joyner signed, generating orders that laboratories billed to Medicare. From that evidence, a rational jury could find that an offense was committed by others and that Joyner knowingly associated himself with, and sought to advance, the venture. The instruction was therefore warranted.

Joyner also objects that it was fundamentally unfair to instruct on accomplice liability—and on willful blindness—after the court had excluded evidence about the conduct and intent of others. He invokes the due-process principle articulated by the Second Circuit in *United States v. San Juan*, 545 F.2d 314 (2d Cir. 1976), under which a defendant may not be misled into directing his defense at one theory of liability only to be convicted on another theory. *See United States v. Hobby*, 702 F.2d 466, 470 (4th Cir. 1983), *aff'd*, 468 U.S. 339 (1984). But "*San Juan* is not this case." *Id.* From the outset, the indictment charged Joyner with aiding and abetting, so he litigated with full notice of that theory. *Cf. Hobby*, 702 F.2d at 469–70 & n.4. And the same core of operative facts—

27

his review and signing of the pre-populated requisition forms—supported both theories of liability, and his good-faith defense applied with equal force to each. *See id.* at 469–70.[9]

The same evidence that supported the aiding-and-abetting charge supported the willful-blindness charge, which is appropriate where a defendant claims lack of knowledge in the face of evidence supporting an inference of deliberate ignorance. *See United States v. Hale*, 857 F.3d 158, 168 (4th Cir. 2017). Neither instruction denied Joyner due process.

### 2.      The "False Statement" Instruction

The district court instructed the jury that a representation is false "if it is known to be untrue" or "when it constitutes a half-truth or effectively omits or conceals a material fact, provided it is made with the intent to defraud." J.A. 882. Joyner contends this conflicts with *Thompson v. United States*, which held that a statement that is misleading but true is not a "false statement." 604 U.S. 408, 417 (2025).

Because Joyner did not object to this instruction below, our review is for plain error. So Joyner must establish an error that is plain, that affected his substantial rights, and that

---

[9] Nor did the instruction prejudice Joyner, even assuming that counsel was misled. *Cf. Hobby*, 702 F.2d at 469 ("If we assume that defense counsel was misled . . . we can perceive no consequential prejudice to [the defendant]."). And Joyner was not prevented from litigating the question that mattered, *i.e.*, whether he knew—or deliberately avoided knowing—that the operation was fraudulent. The red flags that the government put before the jury to rebut Joyner's claimed good faith—the "plug and play" forms, J.A. 1197, the warning against ordering too many tests to avoid being "flagged," J.A. 801, 1200, and the hundreds of strangers he certified as his "patients"—were his to explain regardless of what MCS's officers were told. And he was afforded an opportunity to explain them: He testified at length to his good faith, cross-examined the government's witnesses, and argued the point to the jury. That the jury did not buy his story does not mean Joyner was whipsawed.

28

seriously affects the fairness, integrity, or public reputation of judicial proceedings. *Olano*, 507 U.S. at 732. He has failed to do so.

Whether the instruction was erroneous at all—much less plainly so—is doubtful. *Thompson* construed § 1014, which criminalizes only "false statement[s]," and held that the term "false" means "not true" and does not reach statements that are misleading but accurate. 604 U.S. at 414–15. But the statutes and indictment here sweep more broadly. Section 1035(a)(1) criminalizes "falsif[ying], conceal[ing], or cover[ing] up by any trick, scheme, or device a material fact," while § 1035(a)(2) criminalizes "mak[ing] any materially false, fictitious, or fraudulent statements or representations." And the indictment charged—and the court instructed on—both paragraphs of § 1035(a) in the disjunctive. Section 1347, under which the challenged definition was delivered, reaches schemes to obtain money "by means of materially false *or fraudulent* pretenses, representations, or promises." J.A. 881 (emphasis added); 18 U.S.C. § 1347(a)(2). An instruction that a representation is false "when it constitutes a half-truth or effectively omits or conceals a material fact, provided it is made with the intent to defraud," J.A. 882, thus arguably tracks conduct that these statutes reach, but which § 1014 does not. *See Universal Health Services, Inc. v. United States ex rel. Escobar*, 579 U.S. 176, 188–89 (2016). Because *Thompson* addressed only § 1014, we cannot say any error in the instruction was "plain." But we need not rest there, because even assuming plain error, Joyner cannot show that it affected his substantial rights.

On plain-error review, Joyner bears the burden to show prejudice to his substantial rights, not the government. *Greer v. United States*, 593 U.S. 503, 507–08 (2021); *United*

29

*States v. Hastings*, 134 F.3d 235, 240 (4th Cir. 1998). He must show a reasonable probability that, without the half-truth language, the outcome would have differed. *United States v. Sherifi*, 107 F.4th 309, 317 (4th Cir. 2024). He cannot. The government's case did not depend on a half-truth theory. It identified three discrete falsehoods in the documents Joyner signed: (1) that the beneficiaries were his "patients," (2) that he would use the results "to pursue care and treatment" for them, and (3) that the tests were medically necessary. And it pressed each one as untrue full-stop, not as true-but-misleading. J.A. 829–32. Joyner's own testimony supplied part of the proof: He admitted he "did not use" the results at all. J.A. 791. Every count rested on forms containing all three representations, so a conviction supported by the "pursue care" and medical-necessity falsehoods stands whatever the jury made of the word "patients."

Joyner answers with the jury's mid-deliberation question—"When is someone considered a patient under a [physician assistant]?" J.A. 898. The note shows the jury took the "patients" representation seriously. It does not show which path the jury walked to its verdict. The jury may have found the statement false after applying the ordinary meaning of "patient," or it may have convicted on the "pursue care" and medical-necessity representations, which Joyner's own testimony established were untrue. The note, in short, is equivocal. And on plain-error review, equivocal is fatal to Joyner, not to the government: A defendant does not carry his burden by showing "that it is impossible to tell whether the

30

verdict returned by the jury rested solely on the misinstruction." *Hastings*, 134 F.3d at 243. The assumed error therefore does not warrant relief.[10]

### E. There Was Sufficient Evidence To Convict Joyner

Joyner moved for acquittal, arguing that the evidence was insufficient to prove that he executed a scheme to defraud or that he made materially false statements. "Defendants raising a sufficiency challenge bear a 'heavy burden.'" *United States v. Ritter*, 167 F.4th 677, 683 (4th Cir. 2026) (quoting *United States v. Huskey*, 90 F.4th 651, 662 (4th Cir. 2024)). We look at the evidence in the light most favorable to the government and assume that "the jury resolved all credibility disputes or judgment calls in the government's favor." *Huskey*, 90 F.4th at 662 (cleaned up). While we review the district court's denial de novo, we will sustain the verdict if "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Millender*, 970 F.3d 523, 528 (4th Cir. 2020).

Section 1347 required the government to prove that Joyner "knowingly and willfully execute[d], or attempt[ed] to execute, a scheme . . . to defraud a health care benefit program . . . in connection with the delivery of or payment for health care benefits." 18

---

[10] One final matter. We have assumed, without deciding, two errors: that the prosecution's rebuttal remark strayed into forbidden territory, and that the half-truth instruction was improper after *Thompson*. Considered together, they fare no better than apart. *See United States v. Martinez*, 277 F.3d 517, 532 (4th Cir. 2002) (recognizing that the combined effect of individually harmless errors may affect substantial rights). The assumed errors arose at different stages, were unrelated to one another, and were defused for independent reasons: the rebuttal remark by its ambiguity and invited character, the instruction by the verdict's demonstrated independent basis. Against the weight of the evidence the jury heard, their combined effect did not deprive Joyner of a fair trial.

U.S.C. § 1347(a).  The jury heard that Joyner, using "plug and play" forms, issued orders resulting in more than 14,600 genetic tests for some 607 beneficiaries, although he had spoken with only 20 of them; that the tests were medically unnecessary; that White trained providers not to order too many at once to avoid being "flagged" in audits; and that the training cautioned against "no-no words" like "free" and "Medicare."  J.A. 302, 800–01, 1197, 1200.  From this evidence, a rational juror could find beyond a reasonable doubt that Joyner was aware of or willfully blind to his participation in a scheme to defraud Medicare. The same evidence suffices to support his liability as an aider and abettor.  *See Moye*, 454 F.3d at 398.

Under § 1035(a), the government had to prove that Joyner knowingly and willfully made materially false statements in connection with the delivery of or payment for healthcare benefits.  18 U.S.C. § 1035(a).  Because the evidence sufficed under § 1035(a)(2)'s false-statement prong, we need not consider the government's proof under the concealment prong.  *See supra* II.D.2.  As explained above, the jury heard that Joyner represented he would use the test results to pursue care for the beneficiaries and to make patient-specific clinical decisions, and that he admitted he did not use the results at all. That evidence permitted a rational jury to find the materially false-statement element satisfied.  Joyner's insistence that the forms identified him as the "ordering," not the "treating," provider, and that the medical-necessity criteria were disclosed on the forms, goes to the weight the jury was free to assign the evidence, not to its sufficiency.  On this record, viewed in the light most favorable to the government, the evidence was sufficient.

32

## F.      Resentencing Is Not Warranted

Joyner argues that the district court's sentence was procedurally unreasonable, raising three challenges to his Guidelines calculation: the use of $10 million in intended loss, the mass-marketing enhancement, and the enhancement for use of a special skill or abuse of a position of trust. We review whether the district court imposed a procedurally reasonable sentence for abuse of discretion. *United States v. Jenkins*, 169 F.4th 497, 518 (4th Cir. 2026). And we will not disturb a sentence based on a Guidelines error that is harmless. *United States v. McDonald*, 850 F.3d 640, 643 (4th Cir. 2017). None of Joyner's challenges warrant resentencing.

### 1.      Loss Amount

Section 2B1.1(b)(1) increases a fraud defendant's offense level according to the loss amount, defined as the greater of actual or intended loss. U.S.S.G. § 2B1.1 cmt. n.3(A) (2023). At sentencing, the government acknowledged that Joyner neither helped the laboratories bill Medicare nor knew how they did so. And it agreed that the claims-submission evidence was "somewhat speculative." J.A. 918. The district court nonetheless held Joyner responsible for those submissions. Finding that Joyner "clearly knew that this was fraudulent activity he jointly engaged in with others," and that the laboratories' billing was reasonably foreseeable to him, the court set his intended loss at more than $10 million—the full amount that the laboratories had claimed from Medicare. J.A. 922. That figure produced a corresponding increase in his sentence under § 2B1.1(b)(1), along with a further increase under § 2B1.1(b)(7), for an offense affecting a government healthcare program in an amount exceeding $7 million. After adjustments for Joyner's minor role

33

and zero criminal-history points, the court varied downward three levels—from the intended-loss assessment to the actual-loss assessment—and, after considering Joyner's remaining arguments for mitigation, declined any further variance.   Joyner does not contend that intended loss is an impermissible measure of loss under § 2B1.1 as a matter of law.[11]   Nor does he dispute that the roughly $3.6 million that Medicare actually paid on his orders is attributable to him.   Rather, he argues that he could not have reasonably foreseen the $10 million that the laboratories *billed*—the intended-loss figure—because he played no role in submitting bills, had no insight into the laboratories' billing practices, and did not know what the laboratories would charge.   He argues that the district court should have attributed only the actual loss amount of $3.6 million.

Because others produced the loss by billing Medicare, the question is governed by the relevant-conduct principles of U.S.S.G. § 1B1.3(a)(1)(B).   In a jointly undertaken criminal activity, a defendant is accountable for the acts of others that fell within the scope of the activity he agreed to, that furthered the criminal activity, and that were reasonably

---

[11] Joyner accepts that intended loss is a legally permissible measure under § 2B1.1(b).  In 2023, the Guidelines commentary, rather than the guideline text itself, defined "loss" as the greater of actual or intended loss.  Because Joyner raises no challenge to the commentary's definition, we apply it without deciding what deference it would command in a different case.  We note only that this Court has held the same definition authoritative under the framework of *Kisor v. Wilkie*, 588 U.S. 558, 573–76 (2019). *United States v. Boler*, 115 F.4th 316, 323–25 (4th Cir. 2024); *United States v. Booker*, 146 F.4th 332, 348 (4th Cir. 2025).  Nothing in our disposition depends on what level of deference we owe the commentary, a question that the Supreme Court has agreed to consider, *see Beaird v. United States*, No. 25-5343, *cert. granted*, 224 L. Ed. 2d 496 (Apr. 20, 2026), and one the Sentencing Commission has since mooted prospectively by moving the definition of "loss" into the guideline text itself, *see* U.S.S.G. App. C, amend. 827 (effective Nov. 1, 2024).

foreseeable to him. *Id.*; *see United States v. Bolden*, 325 F.3d 471, 499 (4th Cir. 2003). The government need not prove the loss with precision; "[t]he court need only make a reasonable estimate of the loss." U.S.S.G. § 2B1.1 cmt. n.3(C); *see United States v. Cloud*, 680 F.3d 396, 409 (4th Cir. 2012). We will reverse that estimate only for clear error, and we find none.

The district court found that Joyner "clearly knew that this was fraudulent activity he jointly engaged in with others." J.A. 922. The trial evidence amply supports this finding. Joyner knew he was one of numerous providers feeding a single pipeline; he was trained alongside other providers by White and Dr. Smith; and he understood that the genetic tests he ordered through pre-populated forms would be processed by laboratories and billed to Medicare, the program every beneficiary file identified as the payer. The scheme's entire object was to generate Medicare billings. So the fact that the laboratories did in fact bill Medicare for the tests that Joyner ordered was not some remote contingency. Rather, it was the foreseeable—indeed, intended—consequence of the scheme. On these facts, the district court permissibly attributed the resulting $10 million in billings to Joyner as reasonably foreseeable conduct in furtherance of the jointly undertaken scheme.

In any event, any error in attributing the $10 million in intended losses rather than the $3.6 million in actual losses was harmless. A Guidelines error does not require reversal where the district court would have imposed the same sentence had it resolved the disputed issue the other way, and the sentence would be reasonable on the defendant's preferred calculation. *McDonald*, 850 F.3d at 643; *United States v. Mills*, 917 F.3d 324, 330 (4th Cir. 2019). Both conditions are met. The district court explained that though "the intended

35

loss is the loss that should be used under the guidelines, [it] intend[ed] to apply something other than that." J.A. 946. In the end, the district court relied on the actual-loss figure "for purposes of the ultimate sentence." *Id.*; J.A. 962 ("And so the Court will initially vary, as it said it would, from the intended loss assessment to the actual loss assessment," a three-level variance). Joyner responds that this variance also credited his role, sentencing disparities, his community service, his inexperience, and the collateral consequences of conviction such that—on a correctly calculated range—he would have received a further reduction. The record forecloses that inference. The court recited each of those mitigation arguments but expressly grounded the three-level variance in the change from using the intended-loss figure to the actual-loss figure. The court then concluded that "any further variance" would not produce a sentence "sufficient to accomplish" the § 3553(a) factors. J.A. 963. The court cited Joyner's "callous indifference to the fiduciary responsibilities he [bore] . . . as a Medicare-enrolled provider" and the "strong need to deter that kind of criminal conduct." *Id.* The court thus identified 72 months as the right sentence on Joyner's own preferred loss measure and told us it would go no lower. That's enough under *McDonald*. Finally, a 72-month sentence within the actual-loss range is substantively reasonable for a fraud of this scale and duration. The loss calculation, even if presumed erroneous, supplies no basis for resentencing.

### 2.      Mass-Marketing Enhancement

Section 2B1.1(b)(2)(A)(ii) adds two levels where the offense "was committed through mass-marketing." The Guidelines define "mass-marketing" as a "plan, program, promotion, or campaign that is conducted through solicitation by telephone, mail, the

36

Internet, or other means to induce a large number of persons" to purchase goods or services. U.S.S.G. § 2B1.1 cmt. n.4(A). The district court applied the enhancement, concluding that the scheme was conducted through mass-marketing and that the mass-marketing was reasonably foreseeable to Joyner, who participated in training addressing patient recruitment and referenced marketing in his communications.

Joyner raises two objections: that the mass-marketing was not reasonably foreseeable to him, and that the enhancement cannot apply because any marketing targeted Medicare beneficiaries rather than Medicare itself, the only victim of the fraud.

The foreseeability objection fails for reasons already given. Like the loss enhancement, the mass-marketing enhancement applies based on relevant conduct, reaching acts of others within the scope of the jointly undertaken activity that were in furtherance of it and reasonably foreseeable. U.S.S.G. § 1B1.3(a)(1)(B). The district court found that the recruitment of beneficiaries through telephone solicitation was foreseeable to Joyner, and the record supports that finding: The operation could not function without a steady supply of beneficiaries to be tested, the means of obtaining them was no secret to the providers trained to process their files, and Joyner himself was trained on documentation tied to that recruitment. That finding was not clearly erroneous.

Joyner's other objection asks us to decide for the first time whether the mass-marketing must be directed at the victims of the offense. The commentary defines "mass-marketing" as a "plan, program, promotion, or campaign . . . conducted through solicitation by telephone, mail, the Internet, or other means to induce a large number of persons" to purchase goods or services. U.S.S.G. § 2B1.1 cmt. n.4(A). Joyner reasons that

37

because the Guidelines separately define a "victim" as a person who sustained part of the actual loss, *id.* cmt. n.1, and because Medicare was the only entity that sustained a loss here, the enhancement cannot apply to marketing aimed at beneficiaries who were not themselves victims. He invokes decisions from two other circuits requiring that the mass-marketing target the offense's victims. *See United States v. Lacey*, 699 F.3d 710, 714–15 (2d Cir. 2012); *United States v. Miller*, 588 F.3d 560, 568 (8th Cir. 2009). We are unpersuaded and hold that the enhancement does not require victim-directed mass-marketing.[12]

We are guided by the text in reaching this conclusion. The enhancement applies when the offense "was committed through mass-marketing," U.S.S.G. § 2B1.1(b)(2)(A)(ii), language that describes the *means* by which the offense was carried out, not whom the scheme solicited. The commentary's definition[13] reaches a campaign "to induce a large number of *persons*"—not "victims"—to "purchase goods or services."

---

[12] In holding that the enhancement does not require victim-directed mass-marketing, we do not suggest the solicited beneficiaries were unharmed. The district court observed that the medically unnecessary tests Joyner ordered may impair some beneficiaries' ability to obtain those tests when genuinely needed. J.A. 963. But the Guidelines define "victim" for these purposes as one who "sustained any part of the actual loss" or "bodily injury," U.S.S.G. § 2B1.1 cmt. n.1. So our point is not that the beneficiaries did not suffer; it is that the enhancement's text does not confine "mass-marketing" to solicitation of those who fit the Guidelines' definition of "victim."

[13] Both parties accept the commentary's definition of "mass-marketing." Because no party contends the definition exceeds the guideline it interprets, we apply it without addressing what deference it would otherwise command. *See supra* note 11.

38

*Id.* cmt. n.4(A) (emphasis added).[14]  We will not read in a limitation the Commission omitted.  That the Guidelines elsewhere use "victim" only underscores the point:  The Commission used the word "victim" where it meant victim, and "persons" where it meant persons.  Had it intended the mass-marketing enhancement to turn on the number of victims, it knew how to say so.

Section 2B1.1(b)(2)'s structure supports this reading.  Subsection (b)(2)(A) supplies three independent triggers:  the number of victims, the means of committing the offense (mass-marketing), or a victim's suffering substantial financial hardship.  Subsections (B) and (C) escalate based on the number of victims who experienced substantial financial hardship.  U.S.S.G. § 2B1.1(b)(2).  Reading the mass-marketing clause to require victim-directed solicitation would collapse it into the victim-counting clause beside it.[15]

We do not discount the contrary reasoning.  The Second Circuit reads § 2B1.1(b)(2) as a unified measure of "the scope of the wrong by the number of victims," with mass-marketing relevant "because fraudulent mass-marketing creates a large number of *potential* victims."  *Lacey*, 699 F.3d at 715.  But that rationale—if we can elevate it above the

---

[14] Nor does it matter that Medicare, not the beneficiaries, paid for the tests.  The solicited beneficiaries were induced to obtain—to "purchase"—genetic-testing services; that Medicare footed the bill makes the beneficiary no less the acquirer of the service and the solicitation no less the engine of the sale.

[15] Our conclusion accords with the decisions of two other circuits that have applied the enhancement to healthcare schemes of this structure.  The Fifth and Eleventh Circuits have sustained the enhancement where a defendant was integrally involved in, or where the scheme depended upon, the mass solicitation of beneficiaries whose treatment was billed to a defrauded payer.  *See United States v. Isiwele*, 635 F.3d 196, 204–05 (5th Cir. 2011); *United States v. Mauskar*, 557 F.3d 219, 232–33 (5th Cir. 2009); *United States v. Moran*, 778 F.3d 942, 976 (11th Cir. 2015).

Guidelines' text and structure—applies with equal force here, because the thousands of beneficiaries the scheme solicited "avoided financial loss only because the government as their insurer ultimately bore the cost of the deception." *Id.* at 716. We therefore part ways with the Second and Eighth Circuits and align with the Fifth and Eleventh, which have applied the enhancement to healthcare schemes of this structure. *See Isiwele*, 635 F.3d at 204–05; *Mauskar*, 557 F.3d at 232–33; *Moran*, 778 F.3d at 976.

### 3. Special Skill/Abuse of a Position of Trust

Finally, the district court applied a two-level enhancement under U.S.S.G. § 3B1.3, finding both that Joyner abused a position of trust and that he used a special skill—his physician-assistant licensure—in a manner that significantly facilitated the commission of the offense. J.A. 928–29. The enhancement applies "[i]f the defendant abused a position of public or private trust, *or* used a special skill, in a manner that significantly facilitated the commission or concealment of the offense." U.S.S.G. § 3B1.3 (emphasis added). By its own terms, the two prongs are independent: Either, standing alone, supports the enhancement.

We affirm without reaching the special-skill prong, because Joyner has not contested the alternative ground—abuse of a position of trust—on which the district court independently grounded the enhancement. His opening brief challenges only the special-skill prong; it does not argue that the district court erred in finding that he abused a position

40

of trust.[16]  An argument not raised in an opening brief is forfeited, and we treat it as such here.  *See United States v. Walton*, 145 F.4th 476, 489 (4th Cir. 2025); Fed. R. App. P. 28(a)(8)(A).  Because the unchallenged abuse-of-trust finding independently supports the enhancement under § 3B1.3, we affirm its application without reaching the special-skill question.[17]

*          *          *

Joyner's defense was that he was a small player in someone else's fraud—a guileless provider who trusted seasoned professionals and never saw the scheme for what it was. The jury was entitled to accept that defense.  But it rejected it.  Nothing Joyner raises on appeal disturbs that verdict or the sentence built on it.  The rulings he challenges were within the district court's discretion, the errors we have assumed did him no harm, and the findings underlying his sentence were not clearly erroneous.  "A defendant is entitled to a fair trial but not a perfect one."  *Lutwak v. United States*, 344 U.S. 604, 619 (1953).  Joyner received just that.  The judgment of the district court is

*AFFIRMED.*

---

[16] On reply, Joyner argues that the opening brief's statement of issues raised the issue.  But an issue statement is not argument.  *See Grayson O*, 856 F.3d at 316.

[17] Even so, there are reasons to think that the district court's finding would survive even if we proceeded on the merits.  Section 3B1.3's commentary describes a "special skill" as one "not possessed by members of the general public and usually requiring substantial education, training or licensing," offering "doctors" and other licensed professionals as examples.  U.S.S.G. § 3B1.3 cmt. n.4.  The genetic-test orders at the heart of this scheme could be executed only by a licensed medical provider; that is why the operation needed Joyner.  He used the very credential that distinguished him from the public—his physician-assistant license—to supply the authorizing signatures without which the scheme could not bill Medicare.

41